**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-2747
_____

JOSEPH CANADA,
Appellant

v.

SAMUEL GROSSI & SONS, INC.

_____

On Appeal from the District Court for the
Eastern District of Pennsylvania
(D.C. No. 2-19-cv-01790)
District Judge:  Hon. Jan E. DuBois

_____

Argued on May 27, 2021

Before: McKEE, RESTREPO, and FUENTES, *Circuit
Judges*

(Opinion filed: September 15, 2022)

Timothy S. Seiler            (**Argued**)
Karpf Karpf & Cerutti
3331 Street Road
Suite 128, Two Greenwood Square
Bensalem, PA 19020
          *Counsel for Appellant*

Brad M. Kushner            (**Argued**)
Stevens & Lee
1500 Market Street
Centre Square
East Tower, Suite 1800
Philadelphia, PA 19102
　　　　　*Counsel for Appellee*

––––––––––––

OPINION OF THE COURT

––––––––––––


McKEE, *Circuit Judge*

　　Joseph Canada appeals the District Court's dismissal of his retaliation claims against Samuel Grossi and Sons, Inc. ("Grossi"), his former employer. The claims were brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 1981, the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA"). Although Grossi argued that it fired Canada for misconduct that was discovered during a search of his cellphone, Canada claims Grossi's true motive for firing him was retaliation for actions that were protected under the aforementioned statutes. For the reasons that follow, we will reverse the District Court's grant of summary judgment to Grossi on Canada's retaliation claims arising from his final termination and remand for further proceedings consistent with this opinion.

**I.**

　　Canada, a Black man, worked for Grossi, a steel producer, for 10 years.[1] Canada suffered from "serious back

[1] We review a grant of summary judgment *de novo*. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). Here, the District Court granted Grossi's motion for summary judgment. *Canada v. Samuel Grossi & Sons, Inc.*, 476 F. Supp. 3d 42, 56 (E.D. Pa. 2020) ("Dist. Ct. Op."). Therefore, we present the facts in the light most favorable to Canada.

2

problems," including herniated discs and arthritis.[2]  These back problems formed the basis of the disability discrimination claims outlined in his original complaint.  Canada claims that throughout his tenure, Grossi management prevented him from accessing forms pertaining to the FMLA and harassed him when he tried to use FMLA leave for his back problems.[3]  Canada eventually obtained FMLA forms on his own.  Thereafter, he would notify Grossi management that he was claiming FMLA leave during his absences from work.  Elena Osorio, Grossi's director of human resources, testified that she never approved FMLA leave for Canada, but that Canada "took FMLA how he wanted,"[4] and she "let [Canada] take his FMLA" leave, and did not assess any attendance points against him for doing so.[5]

Occasionally, when demand for Grossi's products was low, Grossi ordered temporary layoffs.  The layoffs, governed by a Collective Bargaining Agreement ("CBA") between Grossi and a labor union, occurred in order and in preference of seniority.[6]  On one such occasion, Canada was laid off, but only for a day.[7]  He promptly returned to work with the same pay and benefits he enjoyed prior to his layoff.[8]

---

[2] JA 5.

[3] *See* 29 U.S.C. § 2601 *et seq.*

[4] JA 289.

[5] JA 290.

[6] Canada was a member of the Shopmen's Local Union No. 502 of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron.

[7] We need not consider the merits of this first layoff because the retaliation claims were brought only in connection to the second termination.  We note, however, on its face, this one-day layoff is consistent with the workforce reduction policy under the CBA.

[8] The CBA allows more senior employees in one unit to "bump" less senior employees in other units, rather than be laid off themselves as long as the more senior employee is "immediately able to perform the work."  JA 8.  In March 2018, Grossi temporarily laid off twenty-three employees, including Canada.  Canada attempted to avoid the layoff by "bumping" a less senior worker in the paint shop, but Grossi refused to allow him to bump due to a doctor's note that he

In March 2019, the same month as Canada's one-day layoff, Canada "filed a charge . . . with the EEOC . . . outlining the discrimination and retaliation he [claimed he] had been experiencing."[9] A month later, in April, "[d]ue to the [alleged] continued discriminatory and retaliatory treatment from . . . management," Canada filed the first complaint in the District Court, alleging race discrimination, retaliation, and a hostile work environment under Title VII, § 1981, the ADA, and the FMLA.[10] After filing his lawsuit against Grossi, John Grossi,

---

offered months before. The note explained that he must be excused from working with paint due to his health. Upon submitting the note, Canada was transferred out of the paint shop to work as a machine operator.

Right before the scheduled layoff, Canada presented Grossi with another note from a different doctor that stated in its entirety: "Joseph Canada may work around paint." JA 9. Canada testified that he procured this letter to shield against the impending layoff. Grossi, however, did not accept the note because "it [didn't] say anything about [Canada's] previous issue" and "the doctor that wrote [the second note didn't] have the medical history to approve" his transfer back to the paint department. JA 9 (second alteration added).

[9] Appellant Br. at 16; *see also* JA 67. Canada alleges that he was subject to discrimination and a hostile work environment at Grossi based on his being a Black man. In a deposition, Canada testified that between March 2018 and July 2019, various co-workers and superiors used the word "nigger" in the workplace. JA 115. He testified that his co-worker called him nigger twice. JA 115 (explaining that in March 2018, his co-worker called him a "fucking nigger" after he accidently knocked over the co-worker's radio, and then in February 2019, he called him it a second time). In fact, when Canada complained to Osorio about this co-worker, Osorio expressed that she saw no issue. Specifically, Canada testified that she told him that she and her sister "dated black guys and [have] said, 'nigger' before." JA 115.

[10] JA 68; *see also* JA 41-60 (first civil action complaint). Ultimately, Canada filed his Second Amended Civil Action Complaint in November 2019. He alleged race discrimination, retaliation, and hostile work environment under both Title VII of the Civil Rights Act of 1964, 42

one of the company's owners, approached him and threatened that if he did not drop the lawsuit, "I'll [ ] just have other African-American employees say the opposite of what you're saying."[11] Canada was terminated a month later, in July 2019.

Grossi based the termination on text messages that management found on Canada's cellphone. The incident that led to the discovery of these text messages is at the heart of this appeal. Canada testified that he used a locker on the shop floor at Grossi to store his personal items, including his tools, clothes, and cellphone, and that he secured the locker with his personal lock, not a work-issued lock. According to Canada, "every operator," such as himself, "had their own locker," either in the locker room or shop floor, for personal storage.[12] This was a mutually-respected arrangement, Canada said, among the employees and the company, and that his locker was no exception.[13] Moreover, Canada explained that because Grossi did not supply tools to its employees, they were required to bring their own. "That's why," Canada emphasized, it was necessary that operators "got their own lockers" for safekeeping of their belongings.[14] Grossi, on the other hand, alleges that personal lockers were located elsewhere, and that Canada was using a locker on the shop floor which was designated as a company tool locker.

While Canada was on vacation in July, Grossi cut the padlock off of his locker and searched it. Grossi claimed that the lockers on the shop floor needed to be moved that day

---

U.S.C. § 2000(d) *et seq.* (Count I) and 42 U.S.C. § 1981 (Count II); actual and perceived disability discrimination, retaliation, hostile work environment, and failure to accommodate under the ADA, 42 U.S.C. § 12101 *et seq.* (Count III); retaliation and unlawful interference under the FMLA, 29 U.S.C. § 2601 *et seq.* (Count IV); unlawful access to stored communications under Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5741 *et seq.* (Count V); and invasion of privacy under state common law (Count VI).

[11] JA 153.
[12] JA 142.
[13] JA 142-43.
[14] JA 143.

because they were blocking a surveillance camera. Despite using a forklift to move the lockers, Grossi alleged that all of the contents of the lockers had to be emptied before moving them. Because Canada was not at work, a Grossi employee cut the lock on his locker and removed its contents, including Canada's personal items and his cellphone. Osorio saw the cellphone and testified that she believed that the phone may have been a company phone "[b]ecause it's a Samsung" and Grossi had issued other employees Samsung cellphones.[15] According to Osorio, she guessed the phone's password on her first try. Later that day, she searched the phone to "find out if it was a company phone."[16]

In her review of the text messages, Osorio found messages from more than a year earlier in which Canada appeared to have solicited sex from prostitutes. In comparing the time records of his text messages to his work hours, Osorio and John Grossi "determined [in their opinion] that he had been soliciting prostitutes while at work and clocked in."[17] Concluding that solicitation of prostitutes during company time violated Grossi's Employee Conduct and Disciplinary Action Policy, Grossi immediately fired Canada. That policy forbids "[u]nlawful conduct which adversely affects the employee's relationship on his/her job, fellow employees, supervisor and/or damages the Company's property, reputation or goodwill in the community" and "[i]mmoral or indecent conduct."[18]

Canada, however, claimed that he was not soliciting prostitutes, never met with any of the women, and the texting was simply "dumb entertainment."[19] After being terminated, Canada amended his previously filed complaint to allege that his termination was retaliation for his complaints of race and disability discrimination.

The District Court granted summary judgment to Grossi on all of Canada's claims. In addressing Canada's

---

[15] JA 303.
[16] JA 303.
[17] JA 12 [alteration in original].
[18] JA 12; 648-649.
[19] JA 12; 147-48.

discrimination claims, it stated: Canada "argues that defendant's reason for terminating his employment was pretextual because defendant's explanation for entering the locker is "'unbelievable' and that Osorio's reason for going through the phone 'to find out if it was a company phone' is also 'unbelievable.'"[20] The District Court concluded, "[h]owever, [that] these arguments relate to the propriety of the search of plaintiff's cellphone, not whether defendant terminated plaintiff's employment for appearing to solicit prostitutes while clocked in and on company property."[21] The District Court found that "[n]o reasonable jury could conclude that defendant's proffered nondiscriminatory and nonretaliatory reason for terminating plaintiff's employment was pretextual."[22] This appeal followed.[23]

## II.

Although Canada makes several arguments on appeal, they all focus on his contention that the stated grounds for his termination were pretext for illegal retaliation for his complaints of race and disability discrimination. Accordingly, we need only address whether the District Court erred in granting Grossi summary judgment on Canada's claim that Grossi's professed justification for terminating him was pretext for a retaliatory motive.

"We review the grant or denial of summary judgment de novo."[24] Our focus is the same as the District Court: We

---

[20] Dist. Ct. Op. at 56; JA 18.

[21] *Id*.

[22] *Id*. The court also concluded that the search was not improper and that it did not violate Pennsylvania privacy laws. *Id*. at 63-65. This appeal does not address the District Court's denial of the claims Canada brought under Pennsylvania state privacy laws because he did not appeal them.

[23] The District Court had jurisdiction under 28 U.S.C. §1331 because the claim arose under federal law. We have jurisdiction over appeals from all final decisions of the district courts under 28 U.S.C. § 1291.

[24] *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019).

7

may only affirm a grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[25] We "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor."[26] "A factual dispute is material if it might affect the outcome of the suit under the governing law."[27] A dispute regarding a material fact is genuine only if the evidence at issue could permit a reasonable jury to decide in favor of the nonmoving party.[28]

We only address Canada's appeal of the District Court's grant of Grossi's motion for summary judgment as to the retaliation claims under Title VII, § 1981, the ADA, and the FMLA. In granting the motion as to these claims, the District Court found that Canada failed to show that Grossi's "nonretaliatory reason [for firing him] was pretextual."[29] After reviewing the evidence, we conclude that the District Court erred in finding that a reasonable jury could not find Grossi's reason pretextual. We thus reverse as to the four retaliation claims and remand for further proceedings.

### 1. *McDonnell Douglas* Framework

---

[25] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020).

[26] *Scheidemantle*, 470 F.3d at 538.

[27] *Razak*, 951 F.3d at 144 (internal quotations omitted)

[28] *Halpern v. F.B.I.*, 181 F.3d 279, 287 (2d Cir. 1999).

[29] Dist. Ct. Op. at 54-55; JA 16.

Retaliation claims are cognizable under Title VII,[30] § 1981,[31] the ADA,[32] and the FMLA.[33] In *McDonnell Douglas Corp. v. Green*,[34] the Supreme Court established the analytical framework that govern claims of allegations of retaliation for engaging in protected activity under Title VII. Therefore, Canada's retaliation claims, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework established in *McDonnell Douglas*.[35] We have also applied this framework to other retaliation claims including those in the ADA, and the FMLA.[36]

Under the first step of that framework, a plaintiff "must establish a prima facie case by showing '(1) [that she engaged in] protected employee activity; (2) adverse action by the

---

[30] 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").

[31] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that § 1981 "encompasses claims of retaliation").

[32] 42 U.S.C.A. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.").

[33] 29 C.F.R. § 825.220(c) (describing the FMLA's prohibition against "retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights.").

[34] 411 U.S. 792 (1973).

[35] *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir.2006).

[36] *Stewart v. Rutgers, The State Univ*., 120 F.3d 426, 432 (3d Cir. 1997) (applying *McDonnell Douglas* to § 1981 claim); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (applying *McDonnell Douglas* to ADA retaliation claim); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (applying *McDonnell Douglas* to FMLA retaliation claim).

employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'"[37]  Upon making these showings, the employer then, under step two, has the burden of producing evidence that "present[s] a legitimate, non-retaliatory reason for having taken the adverse action."[38]  If the employer meets this burden, the burden then shifts "back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"[39]

Here, the District Court granted summary judgment to Grossi because it held that Canada failed to successfully rebut Grossi's proffered reason for searching his cellphone.  In the rebuttal, Canada attacked Grossi's motivation for the search, arguing that its explanation for engaging in the search was unbelievable.  The District Court rejected this argument explaining that it "relate[s] to the propriety of the search of [Canada's] cellphone, not whether [Grossi] terminated [Canada's] employment for appearing to solicit prostitutes while clocked in and on company property."[40]  The District Court therefore reasoned that the motivation behind the search and Grossi's explanation for engaging in the search had no bearing on the pretext analysis.  We disagree.

### 2.    An employer's motivation for investigating an employee can be relevant to pretext.

To defeat summary judgment at the third *McDonnell Douglas* step, the "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause

---

[37] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

[38] *Daniels*, 776 F.3d at 193.

[39] *Id.* (quoting *Moore*, 461 F.3d at 342).

[40] Dist. Ct. Op. at 56; JA 18.

10

of the employer's action."[41]  An employee may meet her burden by "painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent."[42]  Or, for example, "by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of his protected class more favorably."[43]

At the summary judgment stage, "[w]e consider 'a broad array of evidence,'" including "antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."[44]  If the plaintiff makes this showing, summary judgment is improper because the plaintiff has raised "a factual issue regarding the employer's true motivation for discharge."[45]

---

[41] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[42] *Id.* at 765.

[43] *Id.*

[44] *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). Although these statements in *Daniels* were made with respect to the *prima facie* case of discrimination, we have maintained that "evidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000). *See also Jalil v. Avdel Corp.*, 873 F.2d 701, 709 n.6 (3d Cir. 1989) ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.  As we have observed before, the *McDonnell Douglas* formula does not compartmentalize the evidence so as to limit its use to only one phase of the case.").  Accordingly, our statement that we can consider "any other evidence" suggesting the employer acted out of retaliatory animus applies equally to the Canada's demonstration of pretext.

[45] *Jalil*, 873 F.2d at 707.

11

We look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive. We explained the necessity for this in *Aman v. Cort Furniture Rental Corp.*[46] There, we described how "[d]efendants of even minimal sophistication will neither admit discriminatory animus or [sic] leave a paper trail demonstrating it."[47] This is no less true for employers who retaliate against employees who have filed complaints of discrimination or accused an employer of racial bias. Indeed, a contrary rule would not only immunize employers who retaliate against employees only after they stumble upon something that would justify their termination; it would also incentivize such retaliatory forays.

Although the point could certainly have been pled with greater clarity, Canada alleged "that he was subjected to pretextual discipline . . . and terminated a second time . . . in retaliation for his complaints of race discrimination"[48] and "disability discrimination/retaliation."[49] His complaint sets forth a factual basis for the allegation.

Canada relies in part upon *Hobgood v. Illinois Gaming Board*[50] in arguing the search of his cellphone was undertaken only in the hope that it would disclose something that would justify terminating him in retaliation for filing complaints alleging illegal discrimination. In *Hobgood*, the Court of Appeals for the Seventh Circuit concluded that an employer's motive in investigating an employee was relevant to establishing pretext under Title VII.[51] Hobgood worked for the Illinois Gaming Board and assisted a colleague in filing a discrimination charge against the Board.[52] Once the Board determined that Hobgood was aiding the fellow employee, it launched a series of investigations into Hobgood's behavior.[53]

---

[46] 85 F.3d 1074 (3d Cir. 1996).

[47] *Id*. at 1082 (alteration in original) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir. 1987)).

[48] JA 89.

[49] JA 96.

[50] 731 F.3d 635 (7th Cir. 2013).

[51] *See id.* at 637.

[52] *Id*. at 637, 641.

[53] *Id.* at 638–39.

Although many of the initial charges the Board subsequently brought against Hobgood were not substantiated, the investigation uncovered evidence that Hobgood had violated a Board policy.[54]   Based upon that violation, the Board terminated Hobgood.[55]   The district court granted summary judgment in favor of the Board in Hobgood's subsequent suit under Title VII.[56]  At the third step of *McDonnell Douglas*, the court rejected Hobgood's claim that he was fired in retaliation for assisting his colleague.[57]   The court concluded that Hobgood was not fired because of his protected activity, but because of the infraction uncovered by the Board's investigation.[58]

The Court of Appeals for the Seventh Circuit reversed.[59] Despite the fact that the Board relied on Hobgood's violation of policy, the court held that "[t]he initiation and scope of [the] investigation . . . support[ed] an inference that the investigation was not prompted by the defendants' belief that Hobgood had [violated Board policy], but was instead prompted by the defendants' desire to construct a case for Hobgood's termination after they discovered that he had been helping [his friend] with his lawsuit" against the Board.[60]   The court reasoned that Hobgood had presented a "'convincing mosaic' of circumstantial evidence," which "when taken as a whole and viewed in a light favorable to Hobgood's case, could convince a reasonable jury that he was the victim of unlawful retaliation."[61]  We believe the same analysis is pertinent here and would allow a jury to conclude that Grossi's stated reason for firing Canada was a pretext intended to thwart any suggestion of illegal retaliation.  The evidence here clearly supports a conclusion that Grossi was looking for something

---

[54] *Id.* at 640.

[55] *Id*. at 641.

[56] *Id.*

[57] *Id.* at 637.

[58] *Id*.  ("The court reasoned that the Gaming Board fired Hobgood not because he had assisted Gnutek but because the 'nature' of that assistance consisted of providing confidential information."  *Id.* at 641).

[59] *Id*.

[60] *Id.* at 646.

[61] *Id*. at 643 (citations omitted).

13

that would justify terminating Canada and that it undertook that search because of Canada's complaints of discrimination.

Grossi attempts to distinguish *Hobgood* by focusing on several differences between that case and the circumstances here, including the fact that "[t]he investigator [there] conducted a far-reaching investigation into all aspects of the plaintiff's work practices."[62] Although we agree that there are distinctions between the circumstances in *Hobgood* and the circumstances before us, we believe they are distinctions without a difference. Moreover, we will not adopt a rule that would countenance limited retaliatory searches and only subject an employer to Title VII liability for more sweeping incursions. For the reasons we have already explained, we reject a rule that incentivizes employers to dig up reasons to fire an employee who has engaged in protected activity, and then immunizes them from suit based upon a subsequent fortuitous discovery of grounds for termination.

Here, as in *Hobgood*, there is a "'convincing mosaic' of circumstantial evidence,"[63] which, when taken as a whole and viewed in a light favorable to Canada's case, could convince a reasonable jury that he was the victim of unlawful retaliation.[64] In other words, the evidence could support a finding that the search itself was retaliatory.

### 3. There are genuine issues of fact precluding summary judgment on Canada's claim of retaliation.

As explained above, for Canada to survive summary judgment at the third *McDonnell Douglas* step, he must show that the evidence would allow a jury to reasonably "(1) disbelieve [Grossi's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Grossi's] action."[65] The evidence here could allow a reasonable jury to conclude either or both. He met that burden by showing Grossi's purported reasons for searching his cell phone are

---

[62] Appellee Br. at 20.
[63] *Hobgood*, 731 F.3d at 643.
[64] *See id.*
[65] *Fuentes*, 32 F.3d at 764.

weak, implausible, contradictory, incoherent, and more likely motivated by retaliation.[66] Moreover, he has shown that Grossi "treated other, similarly situated persons not of his protected class more favorably."[67] Accordingly, summary judgment is inappropriate.

The first piece of evidence that unravels Grossi's expressed reasons for searching the phone is its own employee conduct policy. The District Court explained how this policy bolsters Grossi's argument because it allows for searches of an employee's property. But the District Court failed to appreciate that this search actually violated that policy. The policy allows for searches *if* Grossi "has reasonable suspicion that an individual is involved in misconduct on Company premises."[68] However, while Grossi alleges to have moved Canada's locker because it obstructed the view of a surveillance camera, Grossi employees could not provide *any* legitimate basis for searching Canada's locker, let alone the cellphone inside the locker.

This is clear from the testimony from Grossi management, contradicting any reliance on this policy. Edward Thompson, Canada's direct supervisor, "testified that, prior to plaintiff's termination, he did not have any reason to suspect that [Canada] committed any type of misconduct on company premises."[69] Similarly, Osorio, Grossi's director of human resources, "testified that she d[id] not remember whether 'there was any reason to suspect that [Canada] was involved in any type of misconduct on company premises before his separation.'"[70] We consider this in context with the evidence that John Grossi, one of the company's owners, approached Canada threatening that, if he did not drop the lawsuit, Grossi would "just have other African-American employees say the opposite of what [Canada's] saying."[71] The threat, made to intimidate Canada into dropping his lawsuit, further weakens Grossi's argument.

---

[66] *See id.* at 765.
[67] *See id.*
[68] JA 11.
[69] JA 11–12.
[70] JA 11.
[71] JA 153.

Canada has also shown the overall weakness of Grossi's argument that the text messages were searched to see if the phone was Grossi's property. Osorio testified in her deposition that the cellphone they found was a Samsung (the kind Grossi issued to employees) and cellphones had recently "gone missing."[72] But the veracity of this claim is suspect. Even assuming there is some relevance to whether this was a company phone, as Canada points out, there were many easier, less intrusive, and far more reliable and appropriate ways for Osorio to determine whether the phone inside the locker was a company phone. For example, Grossi keeps a running list of names of employees who were issued company phones, along with the phones' respective serial numbers and device IDs. She could have easily located the serial number or device ID of Canada's phone and cross-referenced it with the data on the list. Thus, it is not at all clear on this record how text messages could establish if the cellphone was a company phone.

A jury is much more likely to view that kind of search as indicative of looking for something that would justify firing Canada rather than trying to figure out if it was a company phone. In addition, Canada claims that his phone was not the same Samsung model that Grossi issued to its employees. That would further support a finding that Grossi employees were trying to dig up dirt on Canada and not trying to ascertain if it was a company phone. Canada also asserts that Osorio would have known this because "she assists with deployment of company phones to employees and," as mentioned before, "maintains a phone list identifying names, numbers, and device IDs for *everyone* who has a company phone."[73]

Despite the lack of a coherent rationale for searching the phone, Osorio searched through more than a year's worth of personal text messages before discovering the messages for which Canada was allegedly fired. The breadth of this search alone undermines the plausibility that Grossi was trying to see if the phone belonged to the company. As we have explained, a jury could find that reading text messages from this far back in time is more suggestive of a search to find an excuse to fire

---

[72] JA 303.
[73] Appellant Br. at 46 (citing JA 284-85, 344-45).

Canada in retaliation for his activity protected under Title VII, § 1981, the ADA, and FMLA.

There is also evidence to support a finding that Grossi treated other employees more favorably. For example, Osorio testified that she was unaware of any other such searches of company lockers and had never searched any other employee's cellphone or personal items. Moreover, an argument can be made that the lockers did not require emptying before being moved, as alleged by Grossi, since a forklift was used.

## III.

For these reasons, we reverse the District Court's grant of summary judgment to Grossi on Canada's retaliation claims under Title VII, § 1981, the ADA, and the FMLA; and we remand to the District Court for further proceedings consistent with this opinion.